*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 11, 2019
(Corrected)

BY CM/ECF & HAND DELIVERY

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    United States v. Christopher Plaford,
                16 Cr. 400 (JSR)

Dear Judge Rakoff:

       The Government respectfully submits this letter in connection with the sentencing of defendant Christopher Plaford, which is currently scheduled for February 20, 2019, to advise the Court of the pertinent facts concerning the assistance that Plaford has rendered in the investigation and prosecution of others. In light of these facts and Plaford's substantial assistance, and assuming that Plaford continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the Sentencing Guidelines, that the Court sentence Plaford in light of the factors set forth in Section 5K1.1(a) of the Guidelines.

## Procedural History

       On June 9, 2016, Plaford pled guilty, pursuant to a cooperation agreement, to a seven-count information before the Honorable Ronnie Abrams, to whom the case was then assigned. The seven counts covered Plaford's involvement in three separate securities fraud schemes at Visium Asset Management, L.P. ("Visium"). Counts One and Two related to Plaford's participation in a securities mismarking scheme and charged Plaford with (i) conspiracy to commit securities fraud and wire fraud, in violation of 18 U.S.C. § 371; and (ii) securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2, respectively. Counts Three and Four related to Plaford's participation in a scheme to commit insider trading based on confidential government information obtained from a political intelligence consultant named David Blaszczak, and charged Plaford with (iii) conspiracy to defraud the United States and to convert property of the United States, in violation of 18 U.S.C. § 371; and (iv) conversion of property of the United States, in violation of 18 U.S.C. §§ 641 and 2, respectively. Counts Five through Seven related to Plaford's participation in a scheme to commit insider trading based on confidential government information obtained from a political intelligence consultant named Gordon Johnston, and charged Plaford with (v) conspiracy to covert property of the United States,

to commit securities fraud, and to defraud the United States, in violation of 18 U.S.C. § 371; (vi) securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2; and (vii) conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, respectively.

On October 16, 2018, Plaford's case was transferred to Your Honor for sentencing.

## Offense Conduct

A.  Visium

Plaford was a partner and portfolio manager at Visium from approximately 2005 through 2013. Visium was a hedge fund manager and an investment advisor registered with the Securities and Exchange Commission ("SEC"), and managed approximately $8 billion in assets across six hedge funds at its peak. Plaford was the main portfolio manager for the Visium Credit Opportunities Fund (the "Credit Fund"), which invested principally in bonds, bank debt, and other credit instruments, and he was also one of the portfolio managers for the Visium Balanced Fund (the "Balanced Fund"), where he managed a "sleeve" of capital.

B.  Securities Mismarking Scheme (Counts One and Two)

The Court is well aware of Plaford's involvement in the mismarking scheme involving the Credit Fund from the 2017 trial and conviction of Stefan Lumiere over which the Court presided. *See United States* v. *Lumiere*, 16 Cr. 483 (JSR).

In summary, from approximately June 2011 through September 2013, Plaford participated in a scheme to defraud investors in the Credit Fund by deceiving them about how the Credit Fund's monthly net asset value ("NAV") would be calculated and exploiting that deception to report fraudulently inflated performance results to investors. As noted above, Plaford was the senior portfolio manager for the Credit Fund and directed the majority of the Credit Fund's investments. He engaged in this scheme with, among others, Lumiere who was a senior analyst and also a portfolio manager, and Jason Thorell, who was the Credit Fund's main trader who executed trades for Plaford and Lumiere. At times, the scheme resulted in the Credit Fund's NAV being overstated by approximately $25 million.

In 2011, the Credit Fund's performance began to suffer, in part because Lumiere's investments were losing money. For that reason, Lumiere initially suggested to Plaford that they mismark certain securities in Lumiere's portfolio. Over time, Plaford, as well as Lumiere and Thorell, mismarked securities throughout the Credit Fund. The goal of the scheme was two-fold: (a) to inflate the Credit Fund's NAV, which represented the aggregate market value of each of its holdings minus its liabilities; and (b) to mislead investors about the liquidity of the Credit Fund's holdings. As established at trial, the NAV was a key metric that Visium used to report its performance to its investors. Liquidity was also important to investors, who strongly preferred that the Credit Fund not hold illiquid assets designated as "Level 3" under Accounting Standard Codification 820.

Plaford was incentivized to increase the Credit Fund's NAV because the higher the NAV, the higher his compensation would be. Plaford received a percentage of the profits of the Credit Fund as part of his compensation. Poor performance would have resulted, and ultimately did result, in the Credit Fund being shut down and Plaford's separation from Visium. Additionally, a higher NAV encouraged further investment and deterred existing investors from exercising their redemption rights.

To implement this scheme, Plaford directed Lumiere to obtain inflated price quotes from hand-picked corrupt brokers. It was Lumiere's primary responsibility to dictate the prices that he wanted the friendly brokers to send back to him. Lumiere personally selected and corrupted the two main brokers used for this purpose: Scott Vandersnow of Princeridge and Jonathan Brook of Janney Montgomery Scott. Both brokers were Lumiere's personal friends. Both brokers worked at firms that did not usually trade the type of securities the Credit Fund held, and thus were more willing to defer to (and ultimately, parrot back) Lumiere's dictated prices. Later, at Lumiere's suggestion, Thorell located a third corrupt broker, Matthew O'Callaghan of Odeon Capital Management, who was selected because he worked at another "bucket shop." As part of the scheme, Lumiere directed Thorell to steer more business to the brokers providing the inflated sham prices.

Plaford also mismarked the value of securities held by the Credit Fund by "painting the tape" — that is, intentionally paying more than necessary for certain bonds so that the resulting inflated prices could be used to mark the value of the Credit Fund. Specifically, on at least two occasions, Plaford and Lumiere purchased China Med 4% bonds over their prevailing market prices. These bonds were in Lumiere's portfolio, and he found the broker to execute these above market trades.

Credit Fund investors were misled and harmed as a result of this scheme. For example, Visium represented to investors that it would use independent prices from external sources. Visium also represented to investors that the pricing function would be carried out independent of the trading function — meaning that the defendant and Plaford would not be marking their own performance. As a portfolio manager, Plaford was well aware of these representations to investors and Plaford himself certified that he was in compliance with Visium's policies on the proper valuation of securities. Nonetheless, the Credit Fund's valuation process violated these representations.

Investors also lost money. Based on documentation provided by Visium, the Government has calculated the loss suffered by investors who invested in the Credit Fund after the fraud began to be between $1.5 million and $3.1 million.

C.   Insider Trading Scheme Based on CMS Information (Counts Three and Four)

Between approximately 2011 and September 2013, Plaford and others participated in a scheme to commit insider trading based on confidential information misappropriated from CMS by David Blaszczak, a "political intelligence" consultant.

CMS is the federal agency within the United States Department of Health and Human Services ("HHS") that administers Medicare and Medicaid. CMS spends more than $1 trillion per year on healthcare benefits and grants to states. One of CMS's primary responsibilities is to establish annually the reimbursement rates that Medicare pays to healthcare providers, such as doctors, hospitals, and nursing homes. These reimbursement rates are significant rules and generally follow a notice and comment procedure — with CMS publicly announcing a proposed rule, followed by a 60-day comment period before the final rule is publicly announced. Proposed rules and final rules are first publicly "displayed" on the CMS website before their formal printing in the Federal Register. CMS keeps its "predecisional" information — CMS's internal consideration of proposed and final rules — confidential until the agency publicly announces its proposed and final rules. CMS generally makes these announcements at around 4:15 p.m., after the stock market is closed. CMS does so because its decisions are market sensitive and can affect the stock prices of publicly-traded companies that are impacted by CMS decisions. CMS also keeps its predecisional thinking confidential to ensure that the public has an equal and fair opportunity to digest CMS's announcements. CMS does not share predecisional information about proposed or final rules with Congress or its staff.

Blaszczak worked as a consultant at a number of Washington, D.C.-based firms that sold so-called "political intelligence" to clients. This information included predictions about upcoming CMS reimbursement rates and how those changes would impact publicly-traded companies in the healthcare space. Blaszczak often based his predictions, in whole or in part, on information that he learned from current employees at CMS, including Christopher Worrall. While Blaszczak would sometimes wander the halls at CMS to pick up information, Worrall was his primary source within CMS. Worrall and Blaszczak were close friends, dating back to their time working together at CMS, and they socialized regularly. Worrall and Blaszczak often discussed Blaszczak helping Worrall get a high-paying private sector job.

Blaszczak's principal clients were hedge funds, including Visium. Visium hired Blaszczak because of his access to CMS employees who provided him with non-public CMS information. During the scheme, Visium paid Blaszczak tens of thousands of dollars for his services.

Plaford was Blaszczak's main contact at Visium. From approximately 2011 through 2013, Blaszczak, Plaford, and others participated in a scheme to obtain and convert to their own use material non-public information from CMS concerning, among other things, internal deliberations and upcoming reimbursement decisions. Plaford used the non-public information he received from Blaszczak to direct a series of securities trades, understanding that the information had come from CMS insiders, directly from the "horse's mouth." (*United States* v. *Blaszczak*, 17 Cr. 357 (LAK), Trial Tr. ("*Blaszczak* Tr.") 1761, 1787-91 (Plaford); *id.* at 1790 (Plaford: "Blaszczak said sometimes they were directly from his contacts within CMS that were working on that specific regulation. . . . Friends, colleagues, however he characterized it.").)

The primary piece of non-public information that Blaszczak provided to Plaford was confidential CMS information about reimbursement rates for home health coverage. Beginning in late May 2013, Blaszczak told Plaford that CMS was going to propose a "huge cut" of "between three and three-and-a-half, and closer to three-and-a-half percent per year from 2014

to 2017."[1] (*Blaszczak* Tr. 1795 (Plaford); *Blaszczak* GX 1759.) Between late May and when the proposed rule was ultimately announced in late June 2013, Plaford spoke to Blaszczak several times to get updates on what CMS was considering with respect to the home health rule. During those calls, Blaszczak said he had a "high conviction" in his prediction, meaning that he was "interacting directly with his counterparties in CMS that were working on the rule, and they were telling him — that's what they were telling him, the cut would be." (*Blaszczak* Tr. 1798 (Plaford).) Following the initial tip, Plaford began to direct that Visium short the securities in two companies that would be affected by the home health cuts and also sold put options in those companies: Amedisys Inc. (AMED) and Gentiva Health Partners Inc. (GTIV).[2] After CMS's June 27, 2013 announcement that it would be cutting home health reimbursement rates, consistent with Blaszczak's tip, Visium earned profits of approximately $358,598.[3] (*Blaszczak* Tr. 623 (Taveras); *Blaszczak* GX 3000.)

        D.      <u>Insider Trading Scheme Based on FDA Information (Counts Five through Seven)</u>

Between approximately 2005 and 2011, Visium retained another "political intelligence" consultant named Gordon Johnston. Johnston provided Visium with material non-public information about the likelihood and timing of FDA approvals for certain generic drug applications. Johnston's primary contact at Visium was Sanjay Valvani, another Visium partner and portfolio manager.[4] This confidential information was used to trade in advance of certain FDA generic drug approval announcements. Valvani, at times and primarily in 2010, shared with Plaford certain confidential FDA information that he received from Johnston, which Plaford used in connection with securities trades.

The FDA is a federal agency within HHS that is responsible for protecting the public health by, among other things, ensuring that drugs intended for human use were safe and effective. The Office of Generic Drugs ("OGD") is an office within the FDA charged with, among other things, approving a pharmaceutical company's ability to sell a generic drug in the United

---

[1] Blaszczak also provided Plaford with non-public CMS information about a proposed reimbursement cut relating to end stage renal disease ("ESRD."). (*Blaszczak* Tr. 1837-39 (Plaford).)

[2] Visium previously had a large short position in both AMED and GTIV, which Plaford maintained as a result of the non-public information that Blaszczak provided. (*Blaszczak* Tr. 615-23 (Taveras); *id.* at 1833 (Plaford); *Blaszczak* GX 3000).

[3] Blaszczak, CMS employee Worrall, and two partners and analysts at Deerfield Management Company, L.P. ("Deerfield"), Theodore Huber and Robert Olan, were convicted at a 2018 trial before the Honorable Lewis A. Kaplan. *See United States* v. *Blaszczak*, 17 Cr. 357 (LAK). Blaszczak, Worrall, Huber, and Olan were convicted for their roles in a parallel scheme involving Deerfield, which resulted in approximately $7.1 million in illegal profits trading on confidential CMS information that Blaszczak provided related to four CMS announcements.

[4] The Government indicted Valvani for his role in the scheme. *See United States* v. *Valvani*, 16 Cr. 412 (SHS). A few days after his arrest, Valvani committed suicide, and the Government filed a *nolle prosequi*, which Judge Stein granted.

States. Federal law established the Abbreviated New Drug Application ("ANDA") process, under which a pharmaceutical company can apply to the FDA for approval to sell a generic version of a brand name drug. Generic drug applications are termed "abbreviated" because they generally are not required to include preclinical (animal) and clinical (human) data to establish safety and effectiveness. The FDA's evaluation of ANDAs is confidential information. The FDA does not disclose to the public when, if ever, an ANDA will be approved; the FDA also does not disclose to the public the status of its deliberations about an ANDA. The protection of this confidential information is central to one of the FDA's core missions: the efficient approval of generic drugs.

From at least in or about 2005 through in or about 2011, Visium retained Johnston as a consultant who, in exchange for a monthly consulting fee, provided "political intelligence" related to, among other things, the likelihood and timing of the FDA's approval of ANDAs. Before becoming a consultant, Johnston had served as the Deputy Director of OGD, where he was responsible for the review and approval of generic drugs. Johnston primarily consulted for Valvani. Visium paid Johnston hundreds of thousands of dollars over the course of its relationship with Johnston. One of Johnston's primary sources of non-public FDA information was an FDA employee ("Individual-1") with whom Johnston had previously worked.

The primary piece of non-public information that Johnston provided to Valvani was confidential FDA information concerning the FDA's approval of a generic version of an anticoagulant drug called enoxaparin. Valvani used this information to trade in advance of the FDA's July 23, 2010 announcement that it had approved an enoxaparin ANDA.

Beginning in the mid-1990s, Sanofi-Aventis S.A. ("Sanofi") manufactured and sold enoxaparin under the brand name Lovenox. Beginning in 2003, three ANDAs were filed with the FDA seeking approval to sell a generic version of Lovenox. In June 2003, Teva Pharmaceuticals, Ltd. ("Teva") and Amphastar Pharmaceuticals, Inc. ("Amphastar") (which was partnered with Watson Pharmaceuticals, Inc. ("Watson")) each filed an ANDA. In August 2005, Sandoz (which was partnered with Momenta Pharmaceuticals, Inc. ("Momenta")) filed an ANDA (the "Momenta ANDA"). Shortly after Teva and Amphastar/Watson filed their ANDAs, Sanofi filed a citizen petition with the FDA opposing the approval of a generic version of Lovenox. These three ANDAs were pending with the OGD for years, during which time it was unclear whether OGD would approve a generic version of Lovenox. Beginning in or about 2005, Valvani tasked Johnston with gathering material non-public information from FDA employees about the FDA's consideration of the enoxaparin ANDAs. As part of the ANDA review and approval process, OGD maintained an internal document tracking the progress of ANDAs, including the Momenta ANDA, and estimating the likelihood and timing of their approval (the "Tracking Document"). Individual-1 had access to the Tracking Document in the course of his employment. The information contained in the Tracking Document was highly confidential and not intended to be disclosed to anyone outside of the FDA. Nonetheless, in conversations with Johnston, Individual-1 disclosed material non-public information about the status of the approval of a generic Lovenox ANDA, including information from the Tracking Document. Johnston, in turn, shared the ANDA-related information with Valvani, whom Johnston knew would use the confidential information to purchase and sell securities.

In January 2010, based on the confidential FDA information that he had received from Johnston, Valvani caused the Balanced Fund to increase its long position in Momenta by four-fold. Valvani also caused the Balanced Fund to short Sanofi's European-traded stock and its ADRs. In total, Valvani's positions based on the Johnston's enoxaparin inside information totaled approximately $113 million.

Valvani also conveyed to Plaford the information obtained from Johnston so that Plaford could execute securities trades in the Credit Fund. Based in part on this information, in or around January 2010, Plaford instructed an analyst to research Sanofi credit default swaps ("CDSs") in anticipation of a generic Lovenox approval. Thereafter, beginning in or about March 2010, Plaford caused the Credit Fund to purchase at least five million Sanofi CDSs, valued at approximately $30,000. These CDSs, which were a form of insurance against the risk that Sanofi would default on its debt, stood to increase in price when a generic Lovenox ANDA was approved.

On or about July 23, 2010 — approximately seven years after the first ANDA was filed — the FDA approved the Momenta ANDA (and denied Sanofi's related citizen petition). This approval was positive news for Momenta, as Momenta was the first company to receive generic Lovenox approval. Accordingly, when the FDA announced its approval of the Momenta ANDA on July 23, 2010, Momenta's stock price increased by nearly 100 percent in one day. The approval of the Momenta ANDA on July 23, 2010 was negative news for Sanofi, which no longer had a monopoly on the drug. As a result, on or about July 23, 2010, the price of Sanofi's stock and ADRs declined. Valvani's trading resulting in Momenta and Sanofi resulted in approximately $25 million in illegal gains, none of which was shared with Plaford. Plaford's trading in Sanofi CDSs did not result in illegal gains.

Cooperation

As noted above, Plaford's cooperation has been substantial and extensive. Specifically, Plaford's cooperation played a key role in three Government investigations: (1) the indictment and conviction at trial of Stefan Lumiere for securities mismarking at Visium in *United States* v. *Lumiere*, 16 Cr. 438 (JSR); (2) the indictment and conviction at trial of David Blaszczak, Christopher Worrall, Theodore Huber, and Robert Olan in *United States* v. *Blaszczak et al.*, 17 Cr. 357 (LAK), and the guilty plea of Jordan Fogel in *United States* v. *Fogel*, 17 Cr. 308 (LAK), related to insider trading at Deerfield, as well as Visium, based on misappropriated CMS information; and (3) the indictment of Sanjay Valvani in *United States* v. *Valvani*, 16 Cr. 412 (SHS), and the guilty plea of Gordon Johnston in *United States* v. *Johnston*, 16 Cr. 406 (ALC), related to insider trading at Visium based on misappropriated FDA information.

A. <u>Information, Proactive Cooperation, and Indictments</u>

In approximately November 2014, the FBI approached Plaford at his home. Shortly thereafter, in early December 2014, Plaford met with the Government for his first proffer session. Although Plaford initially minimized his own conduct and did not fully admit his own culpability during the initial proffer sessions, he subsequently took full responsibility for his conduct. Plaford ultimately proved to be forthcoming, providing complete and detailed information about his and others' roles in these schemes. In total, Plaford participated in approximately ten proffers

beginning in 2014 and continuing through early 2016. During these proffers, Plaford provided significant information regarding the culpability of others in each of three criminal schemes discussed above, including Stefan Lumiere, David Blaszczak, and Sanjay Valvani. Plaford also engaged in proactive cooperation. Moreover, the information that Plaford provided was used by the Government as it approached other witnesses, who eventually agreed to cooperate.

### 1. Securities Mismarking Scheme

With respect to the securities mismarking scheme, Plaford provided detailed information about how he, Lumiere, Thorell, and others engaged in a scheme to inflate the NAV at the Credit Fund. Plaford provided specifics about who was involved, their roles, and the means and methods of the scheme. Plaford explained how the scheme began, how the scheme evolved and spread throughout the Credit Fund, how corrupt brokers were used to procure fraudulent broker quotes, and how the scheme sometimes involved "painting the tape." Plaford's information was corroborated by other witnesses, including Thorell (Plaford's trader at Visium who filed a whistleblower complaint with the SEC), other witnesses, recordings made by Lumiere, and documentary evidence. Ultimately, as the Court is aware, Plaford's information was used to secure Lumiere's indictment. *See United States* v. *Lumiere*, 16 Cr. 438 (JSR).

### 2. Insider Trading Scheme Based on CMS Information

With respect to the CMS insider trading scheme, Plaford provided detailed information about David Blaszczak and the illegal information that he provided to Visium about upcoming CMS decisions. Plaford explained why Blaszczak's information, which was non-public and to which no other political intelligence consultant had access, was important and how he used it to inform trading decisions at Visium. Plaford also provided specific information about illegal tips that Blaszczak made, including one about a CMS home health decision in 2013. He also explained his emails and trading records for the Government.

At the Government's direction, Plaford engaged in proactive cooperation with respect to the Government's then-ongoing investigation of Blaszczak. For example, Plaford had a number of conversations with Blaszczak that were consensually recorded by the FBI. In particular, at the FBI's direction, Plaford "hired" Blaszczak in July 2015 to provide consulting services with regard to CMS's upcoming changes to home-health-services reimbursement. Blaszczak ultimately provided a written report and told Plaford that his conversations with numerous CMS staff informed his prediction of CMS's upcoming announcement.

Plaford's cooperation also played an important role in the Government's investigation of Deerfield. This investigation ultimately led to the approach of Deerfield partner and analyst Jordan Fogel, who agreed to cooperate with the Government. *See United States* v. *Fogel*, 16 Cr. 400 (LAK). In May 2017, the Government indicted David Blaszczak and three other defendants: Christopher Worrall, a CMS employee, and Theodore Huber and Robert Olan, both Deerfield partners and analysts. *See United States* v. *Blaszczak*, 17 Cr. 357 (LAK). Blaszczak was charged both with providing misappropriated CMS information to Deerfield and Visium.

Case 1:16-cr-00400-JSR   Document 19   Filed 01/15/19   Page 9 of 13

Page 9

### 2. Insider Trading Scheme Based on FDA Information

With respect to the FDA insider trading scheme, Plaford provided detailed information about another political intelligence consultant that Visium used, Gordon Johnston, and how Visium portfolio manager Sanjay Valvani used Johnston for years to trade based on misappropriated FDA information. Valvani was Visium's most profitable portfolio manager, managing approximately $2 billion in capital at his peak and earning tens of millions of dollars per year during his most profitable year. Plaford explained how the head of Visium pushed Valvani and others to get an illegal edge. While Valvani had the primary relationship with Johnston and closely guarded the information he received within Visium over many years, Plaford admitted that Valvani sometimes shared some of Johnston's information with him, primarily in 2010. In particular, Plaford admitted that he purchased approximately $30,000 in Sanofi CDSs based on information that Valvani provided to him.

Plaford also engaged in proactive work with respect to this investigation. At the direction of the FBI, Plaford participated in a number of consensually recorded conversations with Valvani and Johnston. Plaford's cooperation ultimately played an important role in the Government's approach of Johnston, who agreed to cooperate with the Government. *See United States* v. *Johnston*, 16 Cr. 406 (ALC). And, of course, Plaford's cooperation played an important part of the investigation that ultimately led to Valvani's indictment for his central role in a massive $25 million insider trading scheme based on stolen FDA information. *See United States* v. *Valvani*, 16 Cr. 412 (SHS).

### B. Testimony

In addition to providing information that was crucial to the three Government investigations noted above, Plaford testified at two criminal trials, each of which resulted in convictions.

As the Court is aware, Plaford was a key Government witness at Stefan Lumiere's trial in January 2017. Plaford provided detailed testimony about the specifics of the fraud, including the origins of the scheme, how the scheme evolved, Lumiere's role in the scheme, and specifics of their misconduct. Plaford was able to provide a clear and complete explanation of complicated subjects, such as dealer marks, illiquid securities, and painting the tape. This testimony was crucial to the Government's case against Lumiere, and was plainly credited by the jury, which returned a guilty verdict in approximately 90 minutes. The Court sentenced Lumiere principally to 18 months' imprisonment.

Plaford was also a key Government at the *Blaszczak* trial before Judge Kaplan in 2018. Again, Plaford provided clear and compelling testimony about his relationship with and use of Blaszczak. Among other things, Plaford explained that he used Blaszczak because he, unlike other political intelligence consultants, had access to confidential CMS information. Plaford testified that he used the information he received from Blaszczak, in conjunction with other research, to inform his trading decisions. Plaford's testimony was important for two basic reasons. First, it corroborated the testimony of the Government's main cooperating witness at that trial with respect to the Deerfield misconduct, former Deerfield partner Jordan Fogel, who also used

Blaszczak.  Second, Plaford was the main witness against Blaszczak with respect to the parallel scheme at Visium.  All four defendants were convicted.  The fact that Blaszczak was convicted of the Visium-related counts makes clear that the jury credited Plaford's testimony.  Judge Kaplan sentenced Huber and Olan each to 36 months in prison, Worrall to 20 months in prison, and Blaszczak to 12 months and one day in prison.

### Applicable Sentencing Guidelines

The Government believes that the Guidelines calculation in the draft presentence investigation report, dated December 7, 2018 ("PSR"), is correct.  (PSR ¶¶ 51-64, 109.)  The Government notes that a 22-level increase is warranted because the total loss or gain is between $25 million and $65 million, pursuant to U.S.S.G. § 2B1.1(b)(1)(L).  The Government arrived at this range as follows:

| | |
|---|---|
| Counts One and Two: | $1.5 million to $3.1 million (PSR ¶ 22) |
| Counts Three and Four: | $330,598 (PSR ¶ 28) |
| Counts Five through Seven: | $25 million (PSR ¶¶ 41, 43) |

As is evident, the loss or gain attributable to Counts Five through Seven drive the applicable loss enhancement under § 2B1.1.  The Government notes that the $25 million gain is derived from co-conspirator Sanjay Valvani's trading based on FDA information misappropriated by Johnston and that Plaford did not directly profit from Valvani's trading.  Plaford's trading based on this same information, which he received from Valvani, resulted in no gain.

### Section 5K1.1 Factors

Section 5K1.1(a) of the Guidelines provides that the Court is to consider the following five, non-exclusive factors in deciding upon "[t]he appropriate reduction" from the otherwise applicable sentencing range.  The application of each of those factors to Plaford's cooperation is set forth below.

1. *"[S]ignificance and usefulness" of assistance (§ 5K1.1(a)(1))*.  The value of Plaford's cooperation cannot be understated.  Plaford provided the Government with key information about three long running securities fraud schemes.  This cooperation was significant and essential in advancing the Government's investigation of the six defendants ultimately charged in the *Lumiere*, *Valvani*, and *Blaszczak* indictments.  Moreover, Plaford's cooperation played an important role in the related cooperation by Johnston and Fogel, which further advanced the Government's investigation.

Plaford's testimony also played a critical role as a witness at the *Lumiere* trial before the Court and the *Blaszczak* trial before Judge Kaplan.  In both cases, Plaford clearly and fully testified about the roles of his co-conspirators, served as a central narrator of the conduct at issue, and explained in simple terms to the jury the complex worlds of securities marking, CMS, and the hedge fund industry. Without Plaford's cooperation, the Government would not have been able to present a complete story to the jury, nor would it have been able to give the jury a firsthand view of the conversations and interactions with Lumiere and Blaszczak.  While the emails and

documentary evidence in these cases were very powerful evidence of the defendants' guilt, Plaford's testimony brought the criminal conspiracies to life, and provided the jury with direct proof of the criminal schemes. Like most complex financial crimes, these types of crimes are hard to uncover and to explain to a jury without an insider like Plaford, who had accepted responsibility for his crimes.

It is also worth noting that Plaford engaged in proactive cooperation, including by making consensual recordings of Blaszczak, Valvani, and Johnston.

Finally, each of these cases were significant prosecutions. Plaford's cooperation resulted in the successful prosecution of two massive fraud schemes at Visium. The *Lumiere* trial was one of only handful of securities mismarking cases that have gone to trial. The *Valvani* indictment was the first involving allegations of insider trading based on confidential information from a political intelligence consultant. The *Blaszczak* indictment was the second such political intelligence insider trading indictment and the first to go to trial. These cases will undoubtedly have a deterrent effect within the hedge fund and political intelligence industries.

2. "[T]ruthfulness, completeness, and reliability" of information and testimony (§ 5K1.1(a)(2)). The Government has never had any reason to doubt that the information provided by Plaford was truthful, complete, and reliable. In fact, much of the information and testimony provided by Plaford was corroborated by other documentary evidence and the testimony of other witnesses.

3. "[N]ature and extent" of assistance (§ 5K1.1(a)(3)). As noted above, the nature and extent of Plaford's assistance cannot be overstated. His cooperation played a key role in the Government's investigations that resulted in the *Lumiere*, *Valvani*, and *Blaszczak* indictments, and the related cooperation by Johnston and Fogel. He also engaged in proactive cooperation against Valvani, Blaszczak, and Johnston. And, of course, he testified at length at the *Lumiere* trial and the *Blaszczak* trial, and prepared with the Government on numerous occasions. Ultimately, Plaford's testimony helped lead to the convictions of all of the defendants.

4. "[A]ny injury suffered, or any danger or risk of injury to the defendant or his family" resulting from assistance (§ 5K1.1(a)(4)). The Government is not aware of any injury suffered by Plaford or his family as a result of his cooperation. Whether he was threatened or not, however, it is inherently risky for a criminal defendant to cooperate with the Government.

5. "[T]imeliness" of assistance (§ 5K1.1(a)(5)). As noted above, in November 2014 the FBI approached Plaford, and he first proffered with the Government in December 2014. Although Plaford initially minimized his own conduct and did not fully admit his own culpability during the initial proffer sessions, he ultimately took full responsibility for his conduct.

Restitution

The Government does not seek restitution from Plaford for the following reasons.

With respect to Counts One and Two, which relate to the securities mismarking scheme, the Government did not seek restitution from co-defendant Lumiere and thus does not do so with respect to Plaford. (July 21, 2016 Sentencing Tr. 32, *United States* v. *Lumiere*, 16 Cr. 483 (JSR) (Dkt. 117).)

With respect to Counts Three and Four, which related to the insider trading scheme involving, CMS, Judge Kaplan ordered the four trial defendants in the *Blaszczak* case and Fogel to payed restitution totaling $1,644.26 on a joint and several basis. (*See* Sept. 13, 2018 Restitution Order, *United States* v. *Blaszczak*, 17 Cr. 357 (LAK) (Dkt. 396); *United States* v. *Fogel*, 17. Cr. 308 (LAK) (Dkt. 78).) That restitution obligation has been satisfied, and thus the Government does not seek with respect to Plaford. (Oct. 30, 2018 Satisfaction of Judgement, *United States* v. *Blaszczak*, 17 Cr. 357 (LAK) (Dkt. 396).)

With respect to Counts Five through Seven, which relate to the insider trading scheme based on confidential FDA information, the Government did not seek restitution from co-defendant Johnston and thus does not do so with respect to Plaford. (Feb. 12, 2018 Sentencing Tr. 9, *United States* v. *Johnston*, 16 Cr. 406 (ALC) (Dkt. 24).)

Forfeiture

The Government seeks $6,611.96 in total forfeiture from Plaford as follows.

With respect to Counts One and Two, the Court did not order forfeiture for co-defendant Lumiere, and thus the Government does not seek it with respect to Plaford. (July 21, 2016 Sentencing Tr. 25, 30, *United States* v. *Lumiere*, 16 Cr. 483 (JSR) (Dkt. 117).)

With respect to Count Three and Four, and consistent with *Honeycutt* v. *United States*, 137 S. Ct. 1626 (2017), the Government seeks $6,611.96 in forfeiture. This conservative number represents only the amount that Plaford unlawfully and personally profited from his crimes. The Government reached that figure by using the methodology that Judge Kaplan employed in *Blaszczak*: the approximate profits that Plaford personally earned given that he was entitled to approximately ten percent of Visium's profits. (*See* Sept. 13, 2018 Sentencing Tr. 72-73, *United States* v. *Blaszczak*, 17 Cr. 357 (LAK) (Dkt. 414); Gov't Sentencing Submission for Huber, *United States* v. *Blaszczak*, 17 Cr. 357 (LAK) (Dkt. 384). As noted, Visium earned approximately $330,598 in illegal profits based on Blaszczak's home health tip. (PSR ¶ 28.) Visium's performance fee entitled it to 20 percent of those profits (*i.e.*, the firm's carry), and Plaford's agreement with the head of Visium, Jacob Gottlieb, generally allotted him ten percent of Visium's profits (*i.e.*, Plaford's carry). Thus, Plaford earned approximately $6,611.96 from the 2013 home health trade, calculated as follows: $330,598 x 0.20 x 0.10.

With respect to Counts Five through Seven, pursuant to *Honeycutt*, the Government does not seek forfeiture because Plaford's CDS trades did not result in any gain.

## Conclusion

As set forth above, the Government believes that Plaford provided extraordinary and substantial assistance to the Government. The Government therefore expects to request at sentencing that the Court sentence him in light of the relevant facts stated above and the factors set forth in Section 5K1.1 of the Sentencing Guidelines.

Respectfully Submitted,

ROBERT KHUZAMI
Attorney for the United States
Acting Under Authority Conferred by
28 U.S.C. § 515

By: __/s/_____
Ian McGinley
Joshua A. Naftalis
Assistant United States Attorneys
212-637-2257/2310

cc: David Smith, Esq.